## TIMBER TRAILS ASSOCIATES ET AL. *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF SHERMAN
### (AC 26836)

DiPentima, Gruendel and Harper, Js.

Argued September 26, 2006—officially released March 6, 2007

*Averardo P. Pascarella,* for the appellants (plaintiffs).

*Robert A. Fuller,* for the appellee (defendant).

*Opinion*

HARPER, J. This appeal involves a challenge to the action of the defendant, the planning and zoning commission of the town of Sherman (commission), in adopting several amendments to the town's zoning regulations. The plaintiffs, Timber Trails Associates,

Tessa Pascarella and Timber Trails Community Service Corporation, collectively own 850 acres of land in the area affected by the amendments. On appeal, the plaintiffs challenge the trial court's conclusions that (1) the commission's chairman did not violate General Statutes § 8-11[1] by participating in the early stages of the amendment process, (2) the procedure used to enact the amendments was not fundamentally unfair and (3) the commission's decision to adopt the amendments was not illegal, arbitrary or an abuse of its discretion. We affirm the judgment of the trial court.

For more than thirty years, the parties have been engaged in litigation over the utilization and development of the plaintiffs' property in Sherman. Notwithstanding this colorful historical backdrop, very few facts are relevant to the present appeal. Timber Trails Associates[2] and Pascarella each own land adjacent to a development known as Timber Trails. Timber Trails Community Service Corporation owns and maintains the roads servicing Timber Trails. All of the plaintiffs' properties are located in an area designated by Sherman's zoning regulations as residential zone B, where lots are required to be a minimum size of 80,000 square feet.

In 2001, the commission amended the town's master plan of development (master plan) pursuant to General Statutes § 8-23.[3] Among other things, the newly

---

[1] General Statutes § 8-11 provides in relevant part: "No member of any zoning commission or board . . . shall participate in the hearing or decision of the board or commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense. . . ."

[2] Timber Trails Associates is a Connecticut partnership controlled by Jerald Greenberg and Henry W. Pascarella. Henry W. Pascarella is the husband of Tessa Pascarella, one of the plaintiffs.

[3] General Statutes § 8-23 (a) (1) provides in relevant part: "At least once every ten years, the commission shall prepare or amend and shall adopt a plan of conservation and development for the municipality. Following adoption, the commission shall regularly review and maintain such plan. . . ."

amended master plan directed the commission to evaluate the zoning regulations within five years to ensure that all residential lots "reflect the amount and conditions of land necessary to meet residential water supply and septic disposal needs on site, in perpetuity."

Accordingly, the commission held several "workshops" from approximately April through September, 2003, to determine whether implementation of the master plan required amending the zoning regulations. During that time, the commission accumulated and reviewed information from a variety of sources. One of those sources was Tom McGowan, a land use consultant. Members of the public were not invited to participate in the workshops.

Thomas A. Joyner, the chairman of the commission, was actively involved in the workshops and formulation of early versions of the amendments. In October, 2003, the plaintiffs filed suit against him and the commission, claiming that Joyner was biased and therefore disqualified from participating in the amendment process. As a result, Joyner voluntarily agreed to refrain from participating in any further activities relating to the proposed amendments.

In November, 2003, the workshops culminated in several proposed amendments to Sherman's zoning regulations. Soon thereafter, the commission published two legal notices in the New Fairfield Citizen News announcing the finalization of the proposed amendments and the convening of a public meeting to discuss them. Besides identifying the sections of the zoning regulations affected by the amendments, the legal notice also stated that "[c]opies of the proposed amendments are on file in the town clerk's office and the planning and zoning commission's office."

As announced in the legal notice, the commission held a public hearing on the amendments on December

2, 2003. At the beginning of the hearing, Art Von Pla-
checki, the first selectman of Sherman, officially noted
on the record that Joyner was not in attendance because
he "recused himself after some deep soul-searching in
what he considers to be the best interests of the town."
Von Plachecki then stated, however, that his absence
should "in no way" be taken to "indicate there is any
conflict" or an inability on his part "to make a very
measured decision."

The commission then read several exhibits into the
record. Immediately prior to the receipt of comments
from the public, the vice chairman of the commission,
John Paul Voorhees, requested that everyone wanting
to speak at the hearing "keep it to three minutes for
courtesy." He then stated that "at the end, we have a
list, and we can go back over—I realize [there are] a
few [for whom] three minutes are going to be difficult."

During the hearing, several representatives of the
plaintiffs voiced their objections to the substance of
the amendments as well as to the procedure used to
enact them. Notably, Henry W. Pascarella, the husband
of Tessa Pascarella, spoke at the hearing and presented
to the commission "detailed written materials, includ-
ing affidavits, letters, maps, exhibits and statements
opposing the amendments."

Later, in December, 2003, the commission held three
additional special meetings to provide an opportunity
for further discussion and consideration of the amend-
ments. McGowan did not attend the public hearing or
the first special meeting on the amendments. He did,
however, attend the last two special meetings, including
the December 17, 2003 meeting at which the commis-
sion officially voted to adopt a revised version of the
proposed amendments. Joyner did not participate in
the public hearing, the special meetings or the final
vote on the amendments.

The amendments modified Sherman zoning regulations §§ 331.3 and 332.3 to exclude certain categories of land from the calculation of the minimum lot area requirement for residential zones A and B. Specifically, as amended, the zoning regulations require that every lot located in residential zones A and B consist of at least 80,000 square feet excluding "(i.) Land reserved for or used as an existing road, right-of-way, accessway, and conservation and utility easements. (ii.) Inland Wetlands and Watercourses as defined and delineated in accord with Sherman Inland Wetland and Watercourses Regulations and Map. (iii.) Naturally occurring slopes of [25 percent] or more as measured using [two-foot] contour intervals [and] (iv.) 100 year Flood Hazard Areas as shown on maps prepared by [the Federal Emergency Management Agency] which are on file with the office of the Town Clerk." The amendments also revised Sherman zoning regulation § 321.4 in order to prohibit the placement of any lot's principal building within any of the four land areas described in §§ 331.3 and 332.3.

In January, 2004, the plaintiffs commenced the present administrative appeal challenging the commission's adoption of the amendments. In substance, the complaint alleged that the amendments were the result of Joyner's "extreme hostility" toward Timber Trail Associates rather than a reasoned response to changing circumstances in the town. In addition, the plaintiffs suggested that they had been "[t]argeted" by the commission because their property is the only large tract of undeveloped land in residential zone B, "contains considerable amounts of wetlands, watercourses, and slopes in excess of [25 percent]," and is "unique in that it is the only large holding of undeveloped land in the town of Sherman that has a modern, state-of-the-art, public water system . . . ."

These allegations formed the basis of numerous legal challenges to the amendments, including the plaintiffs'

claims that (1) although biased, Joyner participated in the enactment of the amendments and thereby violated § 8-11, (2) the procedure used to enact the amendments was fundamentally unfair, and (3) the commission's decision to adopt the amendments was illegal, arbitrary and an abuse of its discretion. After a hearing, the court concluded that there was no merit to any of the plaintiffs' claims and dismissed their appeal.

The plaintiffs thereafter filed a petition of certification to this court pursuant to Practice Book § 81-1,[4] which this court granted on July 27, 2005.

I

The plaintiffs first claim that the amendments should be invalidated pursuant to § 8-11 because Joyner was involved in their formulation despite being personally interested. Because the record is silent as to whether Joyner had a personal interest in the matter, we decline to review this claim.

We begin by setting forth the applicable law. Section 8-11 provides in relevant part: "No member of any zoning commission or board . . . shall participate in the hearing or decision of the board or commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense. . . ." General Statutes § 8-11. In this case, the plaintiffs are only alleging the existence of a personal interest on the part of Joyner. As defined by our Supreme Court, "[a] personal interest is either an interest in the subject matter or a relationship with the parties before the zoning authority impairing the impartiality expected

---

[4] Practice Book § 81-1 (a) provides in relevant part: "A petition for certification in accordance with chapters 124 and 440 of the General Statutes shall be filed by the party aggrieved by the decision of the trial court in the trial court within twenty days from the issuance of notice of the decision of the trial court. . . ."

. . . . A personal interest can take the form of favoritism toward one party or hostility toward the opposing party; it is a personal bias or prejudice which imperils the open-mindedness and sense of fairness which a zoning official in our state is required to possess." *Anderson* v. *Zoning Commission*, 157 Conn. 285, 290–91, 253 A.2d 16 (1968).

"The decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends on the circumstances of the particular case." Id., 291. "If a zoning authority member fails to disqualify himself despite a conflict of interest, the action of the authority in which he participates is invalid." *Dana-Robin Corp.* v. *Common Council*, 166 Conn. 207, 214, 348 A.2d 560 (1974).

In accordance with these principles, our review of the court's decision requires us first to examine its findings as to whether Joyner was personally interested in the matter. This predicate factual question is crucial because if Joyner did not have a personal interest, then he could not have run afoul of § 8-11 by "participat[ing] in the hearing or decision" on the amendments.

A reading of the court's memorandum of decision reveals that the court's findings on the issue of disqualification are unclear. As evidence of Joyner's personal interest, the plaintiffs cited Joyner's voluntary withdrawal from the amendment process and several prior incidents suggesting that Joyner evinced "extreme hostility" toward the plaintiffs.[5]

---

[5] Specifically, the plaintiffs gave ten examples supporting their allegation that "[f]or over thirty (30) years, Joyner has exhibited extreme hostility toward Timber Trails Associates and any attempts by it to develop its land." The court summarized the plaintiffs' contentions as including "allegations that [Joyner] participated in the efforts to increase the minimum lot size from 40,000 square feet to 80,000 square [feet] in the zone where the plaintiffs' property is located, speaks negatively of the plaintiffs in public and in private, attempted to form a tax district in an attempt to take control over the development's private roads, paid road maintenance charges in an untimely

The court found that Joyner "did not concede any personal bias or conflict of interest . . . ." Yet, the memorandum of decision does not reflect that the court made a factual finding regarding his alleged personal interest in the matter. Instead, the court's analysis focuses almost entirely on the secondary question of whether Joyner's actions tainted the final vote on the amendments.

The court's failure to set forth its findings and conclusions on this issue leaves this court in the untenable position of having to speculate about whether Joyner possessed a personal interest warranting disqualification under § 8-11. This court cannot presume what the trial court's factual findings may have been in the absence of its own express statements. It also is not the role of this court to resolve factual questions in the first instance. See *Ocwen Federal Bank, FSB* v. *Charles*, 95 Conn. App. 315, 329, 898 A.2d 197 ("[o]ur role is not to guess at possibilities, but to review claims based on a complete factual record developed by the trial court" [internal quotation marks omitted]), cert. denied, 279 Conn. 909, 902 A.2d 1069 (2006).

It was therefore necessary for the plaintiffs to have filed a motion for articulation, asking the court to provide the factual and legal basis for its ruling. See Practice Book §§ 60-5 and 66-5. "It is well established that [i]t is the appellant's burden to provide an adequate record for review." (Internal quotation marks omitted.) *Wallenta* v. *Moscowitz*, 81 Conn. App. 213, 230, 839 A.2d 641, cert. denied, 268 Conn. 909, 845 A.2d 414 (2004). Because the plaintiffs failed to satisfy that burden, we are compelled to conclude that the record is insufficient to sustain review of the plaintiffs' claim that Joyner

fashion, and filed suit against the plaintiffs over the ownership of certain facilities and trails within the development."

violated § 8-11 by participating in a "hearing or decision" in which he was personally interested. We therefore decline to review this claim.

## II

The plaintiffs next claim that the amendments should be invalidated because the amendment process did not comport with notions of fundamental fairness. Specifically, the plaintiffs object to the voluminous nature of the record, including its inclusion of allegedly irrelevant items, and the commission's failure to include an overlay map that "clearly demark[s] the property affected . . . ." The plaintiffs further protest several aspects of the hearing itself, such as the initial presentation of documents in the record at the hearing, their inability to cross-examine the commission or its expert, McGowan, and their initial restriction to three minutes of speaking time at the hearing. None of the plaintiffs' claims is availing.[6]

---

[6] At the onset, we must clarify some apparent confusion as to the origin and nature of the plaintiffs' claimed "due process right" to a fundamentally fair hearing in this circumstance. Regarding the origin of their alleged "due process right," the plaintiffs are not arguing that either the state or federal constitution afforded them more process than they were provided. Instead, they appear to rely on a line of administrative law cases establishing a right to a fundamentally fair hearing. Yet, "[o]rdinarily, zoning authorities act in either a legislative or an administrative capacity [and] the function of creating zones and adopting zoning regulations is . . . essentially legislative." (Citation omitted.) *Burke* v. *Board of Representatives*, 148 Conn. 33, 38, 166 A.2d 849 (1961); see also *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 542, 600 A.2d 757 (1991) (affirming that zoning commissions act in legislative capacity when they amend zoning regulations). Furthermore, "[t]he fact that the proceeding is legislative, rather than adjudicative, in nature plays a role in the determination of what process is due." *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, supra, 555. To that end, our Supreme Court has explained that "constitutional due process rights" and the "common-law right to due process in administrative hearings" are not coextensive. *Grimes* v. *Conservation Commission*, 243 Conn. 266, 273 n.11, 703 A.2d 101 (1997).

In any case, we need not engage in a prolonged exploration of the exact differences between the procedural safeguards afforded in legislative proceedings as opposed to those protected in administrative hearings. Here,

## A

The plaintiffs first raise several arguments concerning the record itself, including challenges based on its size, its inclusion of some items and exclusion of others, and its alleged unavailability prior to the public hearing. All of these claims can be easily disposed of by reference to the broad discretion afforded to commissions when they are enacting amendments to zoning regulations.

"The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]." (Internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 543, 600 A.2d 757 (1991). Just as a commission has discretion to determine the relative weight of the information it receives, it also has the ability to determine how much information to consider. A decision in a case with a voluminous record will be upheld just as quickly as a scant one as long as the record contains support for the commission's ultimate decision.

Consequently, the commission's reliance on a large quantity of information does not constitute a reason for invalidating the amendments. For the same reason, the commission's inclusion of unnecessary information in the record in no way affects the fundamental fairness of the hearing or the validity of amendments enacted thereafter.

The plaintiffs allege that the information contained in the record "was not available prior to the [h]earing for review." Yet, in its memorandum of decision, the court noted that the plaintiffs never supplied any "facts

the commission provided all of the procedural protections that were necessary to ensure that the hearing was fundamentally fair.

or examples of an attempt or a request to acquire special materials . . . ." Even if the plaintiffs had made a request, the court found, there was no evidence suggesting that it would have been refused by the commission.

Further, the plaintiffs' argument that "there was no indication in the [r]ecord that the documents . . . were available for public perusal" evinces a misapplication of the burden of proof on this issue. The commission alleged that the documents were available for the plaintiffs' examination prior to the hearing, and the plaintiffs failed to avail themselves of the opportunity to review them. As observed by our Supreme Court, "[t]here is a strong presumption of regularity in the proceedings of a public body such as a municipal planning and zoning commission." *Murach* v. *Planning & Zoning Commission,* 196 Conn. 192, 205, 491 A.2d 1058 (1985). Because of this presumption of regularity, we must reject the plaintiffs' suggestion that the documents were not actually available as alleged by the commission. The plaintiffs had the burden of demonstrating that the commission improperly withheld the documents. Without evidence that the commission prevented the plaintiffs from viewing the documentary record prior to the hearing, we cannot say that they were denied access thereto.

With regard to the plaintiffs' complaint concerning the lack of an overlay map specifically designating the properties affected by the amendments, it suffices to note that the commission had no obligation to provide any such map. As has been explained, the commission had ample discretion and authority to determine exactly what information it needed to make an informed decision on the propriety of the amendments. Even though the plaintiffs may have found such a map helpful, the commission was not thereby obligated to expend the time and money needed to produce one. In any event,

the commission's failure to do so certainly did not render the hearing fundamentally unfair.

B

In addition to challenging the composition of the record and its alleged unavailability, the plaintiffs also protest several aspects of the hearing itself. Specifically, the plaintiffs contend that they were not afforded the opportunity to question the commission or McGowan, its expert, at the hearing. They further allege that they were deprived of "the right to meaningfully address the issues and facts at hand," in large part because of the three minute time limit initially imposed on members of the public who wanted to comment at the hearing. Again, we find no merit to any of the plaintiffs' arguments.

General Statutes § 8-3 (a) provides in relevant part: "No [zoning] regulation . . . shall become effective or be . . . changed until after a public hearing in relation thereto . . . ." The court held in its memorandum of decision that "[t]he plaintiffs had a full opportunity to meet the issues with which they were confronted." This conclusion was partially based on its finding that the commission revealed at the beginning of the December 2, 2003 hearing "the statutes, regulations, plans, input and other guidance that formed the basis for the amendments."

The court's conclusion is also supported by its finding that the plaintiffs were afforded the opportunity to present opposing evidence at the hearing, as demonstrated by the plaintiffs' submission of "detailed written materials, including affidavits, letters, maps, exhibits and statements opposing the amendments." Further, the court found that commission members reviewed the plaintiffs' evidence and discussed amongst themselves the proper weight to accord it. The plaintiffs have not challenged these findings.

"The principle requiring a testing of testimonial statements by cross-examination has always been understood as requiring, not necessarily an actual cross-examination, but merely an *opportunity to exercise the right to cross-examine* if desired." (Emphasis in original; internal quotation marks omitted.) *Welch* v. *Zoning Board of Appeals*, 158 Conn. 208, 213, 257 A.2d 795 (1969). Here, the court rejected the plaintiffs' claim that they were denied the opportunity to cross-examine McGowan and instead found that the plaintiffs never expressed any interest or desire to do so at the hearing.[7] The plaintiffs counter by asserting that "many people . . . would have, if they could have, asked questions of [McGowan] had he been at the [h]earing." Yet, this speculative statement is trumped by our certainty that no such request was in fact made during the hearing.[8] To the extent that there was never a request to cross-examine McGowan, there certainly cannot be deemed to have been a denial thereof. Accordingly, that claim must fail.

Finally, the plaintiffs claim that the imposition of a three minute time limit on speakers at the public hearing was fundamentally unfair. Although conceding in their brief that no existing law prohibits commissions from setting time limits "as a courtesy" to others, the plaintiffs nonetheless argue that "common sense and logic

[7] The plaintiffs dispute the factual validity of that finding on the basis of the statement of Henry Pascarella's daughter, Christine Pascarella, at the hearing that "[w]e haven't heard testimony from any experts, pro and cons, on different solutions." Yet, on its face, this statement does not connote a request to cross-examine McGowan. There also is no indication in the transcript that the commission did understand or should have understood that comment as expressing such a desire.

[8] We are similarly unpersuaded by the plaintiffs' suggestion in their brief that McGowan was excluded from the hearing as a part of some sort of strategy on the part of the commission. There is no support whatsoever in the record for this type of allegation, and the plaintiffs do not cite any in their brief.

dictate [that] a [three] minute time limit is unacceptable as a ground rule."

As the plaintiffs' lack of authority suggests, this argument has no merit. The court found that the initial three minute time limit was imposed "[i]n an effort to ensure everyone attending the public hearing [had] a turn to speak . . . ." The court further found that, although imposing the time limit, the commission also stated that additional comments of a longer duration could be made at the end of the meeting. Moreover, the court found that the meeting adjourned earlier than anticipated, and the commission specifically asked the plaintiffs at the end of the meeting if they wanted to make further comments.

Given that there was no shortage of time for the plaintiffs to have commented at the meeting, we conclude that the initial three minute restriction did not deprive them of their right to be heard. We also reject the plaintiffs' argument that imposing a time limit under these circumstances was categorically "unacceptable as a ground rule." Creating rules that safeguard all interested persons' right to be heard is not fundamentally unfair.[9]

We cannot conclude, therefore, that the amendments were the end product of a fundamentally unfair hearing or procedure employed by the commission.

## III

The plaintiffs' third and final claim is that the commission's decision to adopt the amendments was arbitrary, illegal and an abuse of its discretion. Specifically, the

[9] We hardly need mention the plaintiffs' conspiracy theories regarding the origin of the three minute time limitation except to illustrate the weakness of their claim. Having carefully reviewed the transcripts, we find no support for the plaintiffs' suggestion that the time limit was the result of a broader "strategy" of silencing opposing perspectives or that it created a "hostile environment" in which people felt unable to express their views.

plaintiffs dispute the commission's conclusion that the amendments were enacted in furtherance of the goals stated in the master plan. The plaintiffs further allege that there is no evidence in the record to support the substance of the amendments, thereby suggesting that the commission's stated reasons for adopting them were pretextual. We find no merit to either argument.

"The settled standard of review of questions of fact determined by a zoning authority is that a court may not substitute its judgment for that of the zoning authority as long as it reflects an honest judgment reasonably exercised. . . . The court's review is based on the record, which includes the knowledge of the board members gained through personal observation of the site . . . or through their personal knowledge of the area involved." (Internal quotation marks omitted.) *Torrington* v. *Zoning Commission*, 63 Conn. App. 776, 786, 778 A.2d 1027 (2001), aff'd, 261 Conn. 759, 806 A.2d 1020 (2002).

"[T]he test of the action of the commission is twofold: (1) The zone change must be in accord with a comprehensive plan . . . and (2) it must be reasonably related to the normal police power purposes enumerated in [General Statutes] § 8-2 . . . ." (Citations omitted; internal quotation marks omitted.) *Harris* v. *Zoning Commission*, 259 Conn. 402, 417, 788 A.2d 1239 (2002). "It is only where the local zoning authority has acted arbitrarily or illegally and thus abused the discretion vested in it that the courts can grant relief on appeal." (Internal quotation marks omitted.) *Lurie* v. *Planning & Zoning Commission*, 160 Conn. 295, 312, 278 A.2d 799 (1971).

In this case, the commission included an "[i]ntroduction and [s]tatement of [p]urpose" section at the beginning of the proposed amendments.[10] "When a zoning

[10] The introduction and statement of purpose section provides in relevant part: "It is the belief of this [c]ommission that . . . these proposed regulations best fulfill its mandate . . . to plan for the orderly future growth of

agency has stated its reasons for its actions, a court should not reach beyond those stated purposes to search the record for other reasons supporting the commission's decision. . . . Rather, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations." (Citation omitted; internal quotation marks omitted.) *Harris* v. *Zoning Commission*, supra, 259 Conn. 420.

Taking proper heed of the rule set forth previously, we turn to the question of whether the amendments were adopted in accordance with Sherman's comprehensive plan of development and constituted a proper subject for regulation under § 8-2. "A comprehensive plan has been defined as a general plan to control and direct the use and development of property in a municipality or a large part thereof by dividing it into districts according to the present and potential use of the properties." (Internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, supra, 220 Conn. 551. "In the absence of a formally adopted comprehensive plan, a town's comprehensive plan is to be

the [t]own of Sherman, particularly . . . To protect property values and the overall health, safety and quality of life of its residents; [t]o provide for an orderly and sustainable growth of the population that will not unduly tax the existing and likely future infrastructure of the [t]own or its ability to provide services and protect the health and safety of its residents; [t]o control the overall density of population in its various zones, and to fulfill the goals of the [s]tate of Connecticut's Plan of Conservation and Development and the Housatonic Valley Regional Plan . . . especially as regards the preservation of the rural character of the town and designation of Sherman in the regional plan as a remote area; [t]o protect the water quality and environmental viability of Candlewood Lake and Squantz Pond, and the [t]own's numerous other bodies of water and watercourses, as recreational resources and possible future water supply resources, and to protect property values of the lands thereon; [t]o protect the quality of drinking water supply throughout the town, including its aquifers, its groundwater and its public water supply watersheds, in particular the Croton watershed."

found in the scheme of the zoning regulations themselves." (Internal quotation marks omitted.) Id.

Article I of Sherman's zoning regulations is entitled "purposes" and contains a list of several goals sought to be fulfilled by the town's comprehensive plan for development. One of the stated goals, set forth in § 120 of the zoning regulations, is "[t]o prevent the pollution of ponds and streams . . . safeguard the water table and encourage the wise use and sound management of natural resources throughout the Town . . . ." In furtherance of this objective, and pursuant to the statutory authority conferred by § 8-23, the court found that the commission amended the master plan in 2001 to require a future evaluation of the zoning regulations' ability to ensure that all residential lots could sustain their own "water supply and septic disposal needs on site."

As a factual matter, the court found that the amendments will "lower the density of development, maintain the rural character of the town and protect the area's watersheds to sustain high water quality." The court also found that the commission intended the amendments to "protect the quality of drinking water in areas including neighboring watersheds," a goal explicitly enumerated in the master plan. Further, the court noted that insofar as the amendments regulate the size and land composition of residential lots, they promote the goal of preventing the pollution of potential water sources.

The results sought to be achieved by the amendments, as well as their functioning in practice, are consistent with the requirement of § 8-2 (a) that zoning regulations "promote health and the general welfare . . . ." Further, both the master plan and the comprehensive plan reference the importance of protecting

Sherman's water supply. There is no colorable argument, therefore, that the amendments do not further any of the goals set forth in these documents.

Still, the plaintiffs allege that the commission lacked a factual basis for adopting the amendments. To support their claim, the plaintiffs contend that the record is "devoid of evidence demonstrating that there was any danger to the drinking water of the affected region or that a danger existed or was likely to exist in the future that would negatively impact public health and safety . . . ." The plaintiffs also argue, as they did before the trial court, that the special conditions of their land negate the intended purpose of the amendments.

By contesting the factual basis of the commission's decision, the plaintiffs have attempted to lure this court into the forbidden territory of fact-finding. We must, of course, reject the invitation because "[i]t is not the function of the court to adjudicate the facts. The court can do no more, on the factual questions presented, than to examine the record to determine whether the ultimate findings were supported . . . by substantial evidence." (Internal quotation marks omitted.) *Timber Trails Corp.* v. *Planning & Zoning Commission*, 222 Conn. 380, 400, 610 A.2d 620 (1992).

The record contains almost 100 exhibits and is, as the plaintiffs concede, quite voluminous. There are various materials and correspondence from the Housatonic Valley Council of Elected Officials, a regional planning agency of which the town of Sherman is a member. The record also includes numerous opinions on the wisdom and efficacy of the amendments, as stated in letters from the public, e-mail correspondence between the commissioners themselves and the materials submitted by the plaintiffs. Having reviewed the record, we see no basis for the plaintiffs' claim that the record is "devoid" of evidence supporting the commission's

decision to adopt the amendments.[11] On the contrary, all of the information, in the aggregate, provided more than sufficient factual justification for the amendments. This is not, therefore, "the rare case in which the legislative judgment of what is beneficial to the community can be superseded by that of the judiciary." *Ghent* v. *Zoning Commission*, 220 Conn. 584, 601, 600 A.2d 1010 (1991).

The plaintiffs argue at length that the evidence contained in the record does not demonstrate a nexus between the amendments and "the community's actual, documented, needs." The plaintiffs miscomprehend the nature of the evidentiary burden placed on commissions when amending the zoning regulations. "[Z]oning agencies ordinarily conduct their proceedings with some degree of informality . . . and . . . the reasons given by a zoning authority, presumably composed of lay persons, to justify its action need not be in a form to satisfy the meticulous criterion of a legal expert." (Citation omitted; internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, supra, 220 Conn. 554. As a consequence of this deferential standard, courts will not necessarily demand "scientific" and "statistical data" supporting a commission's decision, as urged by the plaintiffs.

---

[11] The plaintiffs have included a chart in their brief entitled "evidence trial court relied on to affirm amendments" that purports to compare the substance of the amendments to various exhibits in the record. The chart utilizes the terms "silent," "neutral," "pro" and "con" to describe each exhibits' reference to the subject matter of the amendments.

Although we are unclear as to what exactly the plaintiffs meant by their use of these four terms, our review of the exhibits satisfies us that they include information that could have aided the commission in making an informed decision on the amendments. Indeed, the chart's juxtaposition of the terms "pro," "con" and "neutral" against the word "silent" suggests a concession by the plaintiffs that there is helpful information in these documents.

The plaintiffs also argue in their brief that the master plan requires consideration of "water supply needs *and* septic disposal needs"; (emphasis in original); but the amendments' statement of purpose fails to discuss "septic disposal needs." Similarly, the plaintiffs contend that the commission disregarded section § 114 of the zoning regulations, which requires the commission "[t]o protect and conserve the value of land throughout the Town and the value of the buildings appropriate to various zones . . . ." The response to both of these arguments is simply that the commission, while acting in its legislative capacity, is not required to account for every possible subject on which it could properly have taken action. "[P]erfect harmony in zoning classifications is not the applicable criterion. [E]very line drawn by a legislature leaves some out that might well have been included." (Internal quotation marks omitted.) *Ghent* v. *Zoning Commission*, supra, 220 Conn. 600.

Finally, the plaintiffs attempt to rely on *Bridgeport* v. *Plan & Zoning Commission*, 277 Conn. 268, 890 A.2d 540 (2006), in support of their argument that the commission violated the notice requirement of § 8-3 (a) by not filing maps specifically designating all of the areas affected by the amendments. That case, however, is factually distinguishable from the present case because it involved the rezoning of a particular parcel of land. Specifically, our Supreme Court in that case had to confront "the question of what constitutes a sufficient description of a proposed boundary change for purposes of § 8-3 (a)." Id., 276. Here, however, the commission was not changing the boundaries of a zone but instead changing the nature of the requirements applicable to particular zones. As a consequence, the plaintiffs' reliance on *Bridgeport* v. *Plan & Zoning Commission*, supra, 268, is unfounded.

Our review of the record, therefore, supports the court's conclusion that the plaintiffs were afforded all

of the process they were due, and the commission's decision to adopt the amendments was not arbitrary, illegal or an abuse of its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.